UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG MASON,<br><br>Plaintiff,<br><br>v.<br><br>ASHBRITT, INC., et al.,<br><br>Defendants. | Case No. 19-cv-01062-DMR<br><br>**ORDER ON DEFENDANTS' MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 41, 42 |

This case relates to property damage caused by the Northern California wildfires of October 2017 and subsequent remediation efforts. Defendants AshBritt, Inc. ("AshBritt") and Tetra Tech, Inc. ("Tetra Tech") contracted with the United States government to provide disaster relief services following the fires. Plaintiff Craig Mason, a property owner in Sonoma County, filed this putative class action on February 26, 2019, alleging that Defendants caused property damage and engaged in fraudulent conduct during their remediation efforts. [Docket No. 1.] Mason brings claims for relief under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), as well as state law claims for trespass, conversion, trespass to chattels, and violations of California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 *et seq*. [Docket No. 35 ("SAC").]

Defendants now move to dismiss Mason's RICO claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). [Docket Nos. 41 ("Tetra Mot."), 42 ("AshBritt Mot."), 53 ("Tetra Reply"), 54 ("AshBritt Reply").] Plaintiffs timely opposed. [Docket Nos. 47 ("Opp. to Tetra"), 48 ("Opp. to AshBritt").] Having taken oral argument and after considering the parties' submissions, the motions are granted for the reasons stated below.

## I. BACKGROUND

The following facts are alleged in the operative complaint.

### A. October 2017 Wildfires

Mason, a California resident, owned real property in Sonoma County during the class period, which is defined as October 2017 to the present. SAC ¶¶ 8, 11. In October 2017, a series of wildfires caused extensive damage throughout the Northern California counties of Sonoma, Napa, Mendocino, and Lake, among others. *Id.* ¶ 19. The fires burned over 245,000 acres of land and destroyed over 14,700 homes. *Id.* On October 10, 2017, President Trump ordered federal aid to assist the recovery efforts in areas affected by the fires. *Id.* ¶ 20. The Federal Emergency Management Agency ("FEMA") coordinated those efforts. *Id.* The Army Corps of Engineers ("ACE"), working under FEMA, "oversaw and coordinated contractors' clean up and debris removal work as part of the recovery efforts" (the "Project"). *Id.* ¶ 21. ACE contracted with AshBritt, a Florida corporation, to manage the Project. *Id.* ¶ 22.

### B. Scope of the Project

Under AshBritt's contract with ACE, AshBritt was required to perform various services, including:

> Obtain, analyze and evaluate background soil samples to establish cleanup goals for the project, including asbestos testing. Asbestos testing will not be required if the Contractor is assuming that all ash is toxic and disposing of it at the proper landfill location. If this assumption is not made, tests will be required at a rate of one test per 5000 [cubic yards] of ash.
>
> Collect, consolidate, and remove ash and debris for disposal. This material typically requires special handling and disposal as "designated" or "special" waste at a lined landfill.
>
> Remove three to six inches of soil for reuse or disposal pending waste characterization. If soil is clean, a landfill may accept it as daily cover.
>
> Upon removing all the debris and three to six inches of soil, sample and analyze the remaining soil surface for the same constituents identified as clean-up goals.
>
> If results are higher than the threshold for clean-up goals . . . , the Contractor will remove another layer of soil (from 1/2[] inch to 3 inches) for disposal and conduct re-sampling of the soil. The removal and re-sampling shall be repeated until the remaining soil meets objectives.

> If results are less than the threshold clean-up goals, observe and verify the site preparation for final erosion control and certification.

SAC ¶ 23. In October 2017, AshBritt subcontracted with Tetra Tech to collect and test soil, among other services, on all properties where AshBritt and its debris removal subcontractors performed work. *Id.* ¶ 24; Tetra Mot. at 3. As the Project progressed, Defendants were awarded additional contracts to continue performing work, and each additional contract "included the same terms and requirements" as those listed above. SAC ¶ 25.

### C. Allegations of Excessive Excavation and Removal

Mason claims that the ACE contract required Defendants to perform incremental soil removal by removing small layers of soil and re-sampling the soil for additional contamination before removing more. SAC ¶ 26. He alleges that Defendants "routinely removed excessive amounts of soil, up to six feet in depth at a time far more than was necessary to dispose of contaminants without performing sampling to determine whether the soil was contaminated." *Id.* ¶ 27. He contends that Defendants "instructed or knowingly permitted" subcontractors to perform excessive excavation, and that Tetra Tech on-site supervisors "monitored the workers and approved the removal of excessive amounts of soil without performing sampling to determine whether the soil was contaminated." *Id.* ¶ 28.

Mason lists several examples of the conduct described above:

> In one instance, workers for Ashbritt and its subcontractors took topsoil from surrounding properties and used it to loosely fill an excavated hole to create the appearance that the land had not been overexcavated. The property owner was forced to pay for the cost to compact and backfill the land.
>
> In another instance, a property owner working to rebuild his house in Santa Rosa discovered that workers for a subcontractor contracted and supervised by Ashbritt had overexcavated the land, removed pieces of the foundation, and loosely poured soil to cover it up. As a result, the owner was forced to pay $55,000 for remediation.
>
> In another instance, where 30 truckloads of overexcavated soil were removed from a single individual's land, a supervisor on-site admitted to the property owner that the Army Corps of Engineers had made a mistake by paying the contractors by the ton.

SAC ¶¶ 28-30. Mason does not name the property owners who allegedly suffered these harms or

3

provide dates and locations for when and where the conduct occurred.

Mason alleges that ACE paid AshBritt between $200 and $300 per ton of removed debris. SAC ¶ 32. Mason claims that AshBritt over-excavated land, "with no consideration for contamination levels or the need to remove material and debris," in order to increase its profits. *Id.* According to Mason, Defendants also routinely removed trees that did not meet the criteria for removal under the ACE contract and left contaminated soil on the properties. *Id.* ¶¶ 32, 36.

On August 22, 2018, the Director of the California Governor's Office of Emergency Services ("OES") sent a letter to ACE, informing them that OES had "discovered 'unacceptable' work performed as part of the cleanup effort, including over-excavation destruction of private property, and false reports of uncontaminated soil." SAC ¶ 31. This report issued "[a]fter extensive on-site inspections," and found that ACE's contractors "caused substantial damage to many survivors' properties resulting in revictimization of the affected wildfire survivors." *Id.* The letter speculated that it was "probable this over-excavation was an intentional effort to capitalize on this tragedy by defrauding the government," since the subcontractors were paid by the weight of the soil they removed. *Id.*

### D. The Alleged Enterprise

Both AshBritt and Tetra Tech personnel were "personally involved in overseeing work performed on each property involved in the [Project]." SAC ¶ 33. According to Mason, these personnel "instructed subcontractors to over-excavate properties where proper testing had not been conducted." *Id.* Allegedly, Defendants told state and federal agencies that properties were uncontaminated when either the contamination results were falsified or had not been done at all. *Id.* ¶ 34. Mason claims that Defendants "directed or knowingly permitted subcontractors' over-excavation in furtherance of the common purpose of increasing profits at the expense of the United States government and to the detriment of Plaintiffs." *Id.* ¶ 33.

Mason alleges that this conduct was part of a "cleanup enterprise" between AshBritt and Tetra Tech. SAC ¶ 37. According to Mason, this enterprise has existed for at least four years and involved at least six other joint projects. *Id.* ¶ 38. Similar to the Northern California wildfire project, AshBritt engaged subcontractors for these other projects while Tetra Tech monitored the debris

removal. *Id.* ¶ 39. Mason claims that "[t]he fundamental goal of the enterprise was to maximize the profits of AshBritt and Tetra Tech by over-excavating on subject properties and unnecessarily removing non-debris material without testing for contamination." *Id.* ¶ 40.

### E. Allegations of Fraud

In furtherance of the joint enterprise, Defendants allegedly "submitted false attestations and statements to [ACE] certifying that they had removed necessary amounts of debris and soil from subject properties only after proper contamination testing." SAC ¶ 40. Mason avers that Defendants "communicated with each other via daily mail and e-mail correspondence in furtherance of their scheme" to defraud the U.S. government. *Id.* ¶ 43. He alleges that Defendants generated and submitted false reports to government agencies daily between October 2017 and the present. *Id.* ¶ 45. According to Mason, Defendants represented to the U.S. government that they had only removed contaminated soil and debris from each property when in fact they (1) removed excess soil that was not contaminated; (2) removed trees that did not fit the ACE criteria for removal; and (3) failed to remove contaminated soil. *Id.* ¶¶ 40-42, 45, 47. These false reports were allegedly submitted through mail, e-mail, and the online load ticket system.

### F. Claims and Damages

Mason brings claims on behalf of the class, alleging that Defendants violated RICO by unlawfully maintaining an enterprise for the purpose of defrauding the U.S. government. SAC ¶¶ 51-57. He also asserts numerous state law tort claims, including trespass, conversion, trespass to chattels, and violations of the UCL. *Id.* ¶¶ 71-107. He seeks a judgment awarding class benefits for actual, compensatory, and liquidated damages; injunctive relief prohibiting further unlawful conduct; restitution and disgorgement; civil and statutory penalties; interest; and attorneys' fees and costs. *Id.* at 21.

Defendants move to dismiss Mason's RICO claims under Rule 12(b)(6).

## II. LEGAL STANDARD FOR RULE 12(B)(6) MOTIONS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the

5

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

As a general rule, a court may not consider "any material beyond the pleadings" when ruling on a Rule 12(b)(6) motion. *Lee*, 250 F.3d at 688 (citation and quotation marks omitted). However, "a court may take judicial notice of 'matters of public record,'" *id*. at 689 (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith*, 307 F.3d at 1125-26. The court need not accept as true allegations that contradict facts that may be judicially noticed. *See Mullis v. U.S. Bankr. Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).

### III. MASON'S REQUEST FOR JUDICIAL NOTICE

"The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Mason requests that the court take judicial notice of the ACE contract. [Docket No. 46 ("RJN").] Under the incorporation by reference doctrine, a court may "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are

6

1 not physically attached [to] the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)) (further citations omitted). "The Court may consider the entire document, even if only portions were quoted or referenced in the Complaint." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1122 (N.D. Cal. 2017) (citing *Twombly*, 550 U.S. at 569 n. 13).

In this case, Mason alleges the contents of the ACE contract in the complaint, but the document is not physically attached to his pleading. No party raised a question of authenticity as to the document. Accordingly, the incorporation by reference doctrine applies and judicial notice is not required for the court to consider the ACE contract. Mason's request for judicial notice is denied as moot.

**IV.   DISCUSSION**

Mason brings claims under sections 1962(c) and (d) of RICO. RICO imposes liability on persons "engaged in . . . a pattern of racketeering activity," 18 U.S.C. 1962(c), and defines "racketeering activity as "any act . . . indictable under" certain enumerated federal criminal statutes. 18 U.S.C. § 1961(1). The elements of a civil RICO claim are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quotation omitted). Section 1962(d) of RICO extends liability to individuals who conspire to violate RICO.

Mason's claims are predicated on mail and wire fraud under 18 U.S.C. § 1343. SAC ¶ 63. Specifically, he asserts that Defendants violated RICO by submitting false reports to the government about the work they were performing on the putative class members' properties. Defendants move to dismiss Mason's RICO's claims on four grounds. First, they argue that the alleged acts of mail and wire fraud were not the proximate cause of Mason's claimed injuries and therefore cannot serve as predicate acts for a RICO violation. Second, they assert that Mason failed to sufficiently allege the existence of a RICO "enterprise." Third, they claim that Mason has failed to plead the elements of a RICO claim under the heightened pleading standard of Rule 9(b). Fourth, they argue that, since Mason's substantive claim under section 1952(c) fails, he cannot allege a conspiracy RICO claim

7

under section 1952(d).

For the reasons stated below, the court holds that Mason has not pleaded the requisite causation to substantiate a RICO claim, and therefore does not reach the question of whether Mason has adequately pleaded the other elements of his RICO claim. The court further holds that Mason's conspiracy claim fails as he has not pleaded an underlying RICO violation.

### A. Proximate Cause

To have standing to bring a civil RICO claim, a plaintiff must be injured "by reason of" a violation of section 1962. 18 U.S.C. § 1964(c). This requires the plaintiff to show "that the racketeering activity was both a but-for cause and a proximate cause of his injury." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). Defendants argue that Mason has not shown that the alleged RICO violations were the proximate cause[1] of his injuries.

"RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff." *Oscar v. University Students Co-operative Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992). The case law demonstrates that the proximate cause inquiry operates as a policy limit on which tort victims can make use of the RICO statute and its enhanced damages. In the RICO context, proximate cause is not guided by the rote application of a single test. *Holmes*, 503 U.S. at 274 n. 20 ("[T]he infinite variety of claims that may arise [under RICO] make it virtually impossible to announce a black-letter rule that will dictate the result in every case.") (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S.

---

[1] Tetra Tech also asserts that the predicate acts of wire and mail fraud could not be the but-for cause of the harm Mason suffered because the alleged wire fraud occurred subsequent to the alleged damage. Tetra Mot. at 6. According to Tetra Tech, the alleged RICO violations were the transmission of the reports that fraudulently reported that the Project requirements were met— reports that were submitted after the damage to the properties had already occurred. *Id.* at 7. Logically, it argues, Mason's injuries cannot precede the cause. Mason responds that the harm need not flow directly from the individual acts of mailing and wiring, but rather from the "formation of the scheme" itself. Opp. to Tetra at 18. He argues that the subject properties would not have been over-excavated but for the formation of Defendants' scheme to defraud the government, and therefore the harm suffered came directly from the alleged RICO violation. *Id.*

Each of the cases cited by the parties examine proximate rather than but-for causation. The court need not decide the but-for issue here because Mason has failed to allege proximate cause.

519, 536 (1983)); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (emphasizing that proximate cause is a "flexible concept"). Instead, "we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* at 268. Central to the RICO proximate cause inquiry is the requirement that there is "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268. *Holmes* set forward three considerations relevant to the court's analysis:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 268-70. The *Holmes* considerations are illustrative of the policies addressed by the "direct relation" requirement rather than strict factors that dictate mechanical results. *See id.* at 274 (stating that proximate cause in the RICO context is based on "considerations of history and policy"); *see also Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1147 (9th Cir. 2008) (describing the *Holmes* considerations as "non-exhaustive"); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999), *as amended* (Aug. 18, 1999) ("[T]he outer limits of the direct injury test are described more by [*Holmes*'s policy] concerns than by any bright-line, verbal definition.").

Because there is no bright-line test for proximate cause in RICO cases, it is necessary to examine how the Supreme Court has applied the policy considerations described above. In *Holmes*, the Securities Investor Protection Corporation ("SIPC") sued a number of defendants who allegedly had manipulated stock prices. 503 U.S. at 262. SIPC was obligated to reimburse the customers of certain registered broker-dealers if the broker-dealers became unable to meet their financial obligations. *Id.* SIPC alleged that stock prices plummeted when the defendants' fraud was detected and the decline in stock prices forced two registered broker-dealers into liquidation. *Id.* at 263. As

9

a result, SIPC had to advance $13 million to cover the claims of the broker-dealers' customers. *Id.* One of the defendants, Holmes, had allegedly participated in the conspiracy to manipulate stock prices by making false statements about the prospects of certain stocks. *Id.* The Court held that SIPC could not maintain its RICO claims against Holmes. It examined the legislative history of section 1962(c) and concluded that Congress did not intend to "allow all factually injured plaintiffs to recover." *Id.* at 266. The Court found that SIPC's alleged harm was "purely contingent on the harm suffered by the broker-dealers" and was therefore "too remote" from the conduct alleged. *Id.* at 271.

RICO's proximate cause requirement came before the Supreme Court again in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). There, the plaintiff steel supply company sued a competitor and its owners, alleging that the competitor did not charge sales tax to its customers and that defendants filed false tax returns with the state in order to conceal the conduct. *Id.* The plaintiff asserted that the defendants' unlawful conduct allowed the competitor to undercut the plaintiff's prices, which in turn harmed the plaintiff's market share. *Id.* at 458. Following *Holmes*, the Court noted that the direct victim of the defendants' conduct was the state rather than the plaintiff, because it was the state that had been defrauded and lost tax revenue. *Id.* The Court found that the causation element was too attenuated because the action of offering lower prices was "entirely distinct" from the alleged RICO violation of defrauding the state through filing false tax returns. *Id.* at 458-59. The Court accordingly held that the RICO plaintiff failed to establish the element of proximate cause. *Id.* at 458.

In contrast to *Holmes* and *Anza*, the Court found that RICO plaintiffs met the proximate cause requirement in *Bridge*. That case involved parties who were regular bidders in county tax-lien auctions. 553 U.S. at 642. Since the auction participants often tied for a winning bid, the county allocated parcels on a rotational basis. *Id.* It also prohibited bidders from using multiple agents to increase their chances of receiving a parcel. *Id.* at 643. When registering for an auction, each bidder was required to submit an affidavit that it was participating as a single bidder. *Id.* The plaintiff participants brought a RICO claim against other bidders who they alleged had violated the single-bidder rule by using multiple agents in the auctions. *Id.* The defendants argued that section 1964(c)

requires a RICO plaintiff to show that it relied on the defendants' fraudulent misrepresentations. *Id.* at 648. They contended that the single bidder affidavits were submitted to the county, not the plaintiffs, which meant that the plaintiffs could not have relied on any fraudulent misrepresentations contained in the affidavits. *Id.* at 649. The Supreme Court rejected the defendants' argument and observed that the "foreseeable and natural consequences of petitioners' scheme to obtain more liens for themselves [was] that other bidders would obtain fewer liens." *Id.* at 649. It held that first-person reliance is not an element of a RICO claim because "a person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* at 649.

Mason relies on *Bridge*, arguing that it stands for the proposition that proximate cause can be established if the plaintiff's "alleged injury . . . [is a foreseeable and natural consequence of [the] [defendants'] scheme."[2] *See Bridge*, 553 U.S. at 658. Mason's argument is not persuasive. First, *Bridge* focused on the question of first-party reliance, which is not an issue in this case. To the extent the Court addressed the issue of proximate cause at all, it was to show that first-party reliance is not necessary to establish that element. Accordingly, Mason relies on statements that are taken out of context for an issue that *Bridge* did not examine and are at most dicta. Second, the Supreme Court has subsequently rejected the argument that "RICO's proximate cause requirement turn[s] on foreseeability." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 12 (2010) ("[I]n the RICO context, the focus is on the directness of the relationship and the harm . . . *Anza* and *Holmes* never even mention the concept of foreseeability"). Therefore, even if *Bridge* stood for the proposition asserted by Mason, that holding would not likely survive *Hemi*. Third, while the defendants in *Bridge* made their fraudulent representations to the government rather than the plaintiffs, it was the plaintiffs who suffered damage as a result, and not the government. The *Bridge* defendants' fraudulent statements to the government operated as a tool to gain an advantage over the plaintiffs, which resulted in injury to them. In this case, by contrast, Defendants allegedly schemed to increase their own profits by submitting fraudulent documents to the government in order to justify payment for removing large amounts of debris that should not have been removed, all at the expense of the

---

[2] The parties' arguments regarding the timing of the predicate acts in relation to the alleged harm are not addressed here for the reasons stated in footnote 1: the timing issue goes to the question of but-for causation, which the court need not reach in this case.

11

government; in other words, the government was the target of the scheme and not just a means to harm someone else. *See* SAC ¶ 33. For these reasons, *Bridge* does not control in this case.

*Holmes* is also distinguishable. There, the SIPC's damages were not directly caused by the alleged RICO violation, but instead were derivative of the injury to the broker-dealers' businesses that was then passed through to the SIPC. 503 U.S. at 271. The Court noted the difficulties in proving what portion of the alleged damages arose from the RICO violation as opposed to other factors, such as the broker-dealers' "poor business practices or . . . failure to anticipate developments in the financial market." *Id.* at 273. In this case, Mason is alleging that the harm to his property arose from Defendants' own conduct; unlike *Holmes*, this case does not involve damages in the form of indemnification for an injury suffered by an intervening third party. Therefore, the derivative injury analysis in *Holmes* does not apply here.

*Anza* is more similar to the present case than *Holmes* because the plaintiffs' injuries in that case were not derivative of the harm suffered by the government. *See Anza*, 547 U.S. at 458 ("The attenuation between the plaintiff's harms and the claimed RICO violation arises from a different source in this case than in Holmes, where the alleged violations were linked to the asserted harms only through the broker-dealers' inability to meet their financial obligations.") The Court instead found no proximate cause because the alleged RICO violation was directed at the government rather than the plaintiffs. *See id.* ("The direct victim of this conduct was the State of New York, not [the plaintiff]."). However, *Anza* is not directly on point here because the harm alleged in this case did not arise in the context of economic competition where market forces make determinations of causation murky. *Id.* at 460 (stating that the proximate cause analysis has "particular resonance when applied to claims brought by economic competitors").

The Ninth Circuit's opinion in *Rezner* is a closer fit. There, the plaintiff Rezner purchased a tax shelter from the defendant. *Rezner*, 630 F.3d at 868. The IRS subsequently determined that the tax shelter was unlawful, and as a result, Rezner owed significant back taxes. *Id.* at 869. Rezner brought a RICO claim against the defendant, alleging that it "engaged in a scheme to defraud the United States of tax revenue through fraudulent tax shelters that caused injury to purchasers of such shelters." *Id.* at 868. The district court entered summary judgment for Rezner on his RICO claim.

12

The Ninth Circuit reversed, noting that Rezner's alleged loss resulted from the defendant's "misrepresentations to the United States regarding the tax treatment" of the financial transaction. *Id.* at 872. It held that the United States was the direct victim because it lost tax revenue as the "direct result of [the defendant's] fraud," while Rezner's "asserted injury only indirectly resulted from [the] fraudulent activity against the United States." *Id.* at 873. The court determined that the government was a better suited plaintiff to recover for the fraud against it and reversed the district court's entry of summary judgment. *Id.* at 873-74.

*Rezner* found that there was no proximate cause because the alleged unlawful conduct was directed at the government and not at Rezner himself. Likewise, in this case, Mason has alleged that Defendants made misrepresentations to the U.S. government in order to increase their profits by making the government pay Defendants for removal of debris that should not have been removed per the government contract. Similar to *Rezner*, Defendants' alleged fraud was directed at the government and Mason's injuries were a biproduct of that fraud. *See* SAC ¶ 33 (alleging that Defendants "directed or knowingly permitted subcontractors' over-excavation in furtherance of the common purpose of increasing profits at the expense of the United States government and to the detriment of Plaintiffs"). Taking Mason's allegations as true, the government is the direct victim of Defendants' alleged fraud. *See C&M Cafe v. Kinetic Farm, Inc.*, No. 16-cv-04342-WHO, 2016 WL 6822071, at *7 (N.D. Cal. Nov. 18, 2016) (holding that the plaintiffs were a direct victim because they were "specifically targeted" by the defendant). The controlling caselaw indicates that RICO is not intended to cover claims by injured bystanders, even if their injuries are a natural result of the alleged scheme. *See Holmes*, 503 U.S. at 266 ("[T]he very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that RICO should not get such an expansive reading."). In fact, the Supreme Court has rejected claims by less direct victims even if their injuries are an *intended* consequence of the unlawful conduct. *See Hemi*, 559 U.S. at 12. Therefore, the government is the most direct victim of the alleged scheme to defraud and the best situated to recover under RICO.[3]

---

[3] Notably, whether the direct victim actually sues "is not dispositive." *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 931 (9th Cir. 1994).

13

This analysis comports with two recent Ninth Circuit decisions regarding RICO proximate cause. *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243 (9th Cir. 2019); *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648 (9th Cir. 2019). In *Painters*, the defendants were pharmaceutical companies who developed and marketed a drug intended to treat type 2 diabetes. 943 F.3d at 1246. A class of consumers sued under RICO, alleging that the defendants intentionally misled them to believe that the drug did not increase their risk of developing bladder cancer, despite having access to studies that showed otherwise, and that the consumers would not have purchased the drug had they known of that risk. *Id.* The district court dismissed the RICO claims on the basis that the plaintiffs failed to establish proximate cause. The Ninth Circuit reversed. It found that the plaintiffs were the "immediate victims" of the alleged scheme because the fraudulent misrepresentations were directed at the consumers who purchased and used the drug. *See id.* at 1251-52. The court held that this consideration was sufficient to satisfy the "direct relation" requirement, and correspondingly, that the plaintiffs were the best situated to sue for the fraud perpetrated against them. *Id.* at 1251. In this case, Defendants' alleged scheme was directed at the government, not at Mason or the putative class. The government is therefore the "immediate victim[]" of the alleged fraud and a more suitable RICO plaintiff.

The court's decision here also aligns with *Harmoni*. There, the plaintiff company Harmoni had a competitive advantage in importing Chinese garlic because it was not subject to the same duties imposed on other importers of that good. 914 F.3d at 650. Harmoni's competitors, the defendants in the case, allegedly filed sham requests with the Department of Commerce so that it would audit Harmoni, with the intent of forcing Harmoni "to incur significant expenses defending itself during the course of the administrative review process." *Id.* at 650. The defendants argued that the plaintiffs had not met RICO's proximate cause requirement because the Department of Commerce was the direct victim of the alleged scheme. *Id.* at 652. The Ninth Circuit rejected this argument on the basis that the sham-filing scheme was aimed at Harmoni and "no more direct victim of the defendants' sham-filing is better position to sue." *Id.* at 652. In other words, as in *Holmes*, the defendants used the government as a tool to inflict harm on the plaintiff, which was the intended direct victim. The fact that the Department of Commerce was also a victim that suffered damage in

14

the form of costs incurred in conducting the sham administrative review did not change the outcome. By contrast, Defendants' alleged scheme in this case is aimed at the government, who is the best situated for the fraud perpetrated against it.

In sum, in view of the considerations expressed in *Holmes* and interpreted by subsequent caselaw, Mason and the putative class are not the appropriate plaintiffs to bring a RICO claim based on Defendants' alleged fraud against the U.S. government.

### B. Conspiracy RICO Claim

As Mason has failed to show that he has standing to pursue a RICO claim under section 1962(c), his conspiracy claim under section 1962(d) also fails. *See Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) ("Because we conclude that the section 1962(c) claim cannot be saved by amendment, it follows that the section 1962(d) claim also cannot be saved.").

Accordingly, Defendants' motion to dismiss Mason's RICO claims is granted.

## V. LEAVE TO AMEND

If the court dismisses one or more causes of action under Rule 12(b)(6), it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleadings could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In this case, although it seems unlikely, the court cannot say with certainty that amendment of the pleadings would be futile.

Therefore, Mason is granted leave to amend his complaint with respect to the RICO claims.

## VI. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Mason's RICO claims is granted. Mason must file an amended complaint by no later than January 24, 2020.

**IT IS SO ORDERED.**

Dated: January 10, 2019



Donna M. Ryu
United States Magistrate Judge

15